**IN THE UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FORT SMITH DIVISION**

| | |
|---|---|
| **In re: DAVID J. ROFKAHR and** | **No. 2:23-bk-71703** |
| **STEPHANIE L. ROFKAHR, Debtors** | **Chapter 13** |

| | |
|---|---|
| **DAVID J. ROFKAHR and** | |
| **STEPHANIE L. ROFKAHR** | **PLAINTIFFS** |
| **v.**     **2:24-ap-07047** | |
| **CITIZENS BANK & TRUST CO.** | **DEFENDANT** |

**ORDER AND OPINION GRANTING**
**MOTION FOR JUDGMENT ON PARTIAL FINDINGS**

On November 14, 2023, David and Stephanie Rofkahr [plaintiffs or debtors] filed their chapter 13 case.  On September 11, 2024, the debtors commenced the instant adversary proceeding against Citizens Bank & Trust Company [Citizens or the bank].  In Counts I through III of their complaint, the debtors alleged that the bank violated the Arkansas Deceptive Trade Practices Act [ADTPA]; in Count IV, they alleged that the bank committed fraud or constructive fraud; and, in Count V, they alleged that the bank was negligent.  On October 11, 2024, Citizens filed its answer.  The Court held a trial on February 25, 2026.  William Marshall Hubbard appeared on behalf of the debtors.  M. Sean Brister appeared on behalf of Citizens.  At the outset of the trial, Mr. Hubbard announced that the debtors wished to dismiss the fraud and negligence claims alleged in Counts IV and V of the complaint, leaving for trial only the ADTPA claims alleged in Counts I through III.  Mr. Hubbard also requested during his opening statement that the Court determine the amount of the bank's secured claim.  In his opening statement, Mr. Brister essentially objected to the Court determining the amount of the bank's claim, stating that such a determination was inappropriate based on the pleadings before the Court.  At the conclusion of the trial, the Court took the matter under advisement.  For the reasons stated below, the Court grants judgment on partial findings in favor of the bank

on the debtors' ADTPA claims.

## Jurisdiction

Pursuant to 28 U.S.C. § 1334(a) and (b), "the district court shall have original and exclusive jurisdiction of all cases under title 11 . . . [and] original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." Under 28 U.S.C. §§ 157(a) and (b)(1), the district court may provide that any such cases "be referred to the bankruptcy judges for the district[,]" and the bankruptcy court "may hear and determine [such] cases . . . and may enter appropriate orders and judgments, subject to review under section 158 of this title." The United States District Court for the Western District of Arkansas has provided for such referrals by local rule. E.D. & W.D. Ark. R. 83.1. Sections 157(b)(1) and (c) further specify the types of cases and matters that may be heard by bankruptcy judges, and these include "cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11" as well as non-core proceedings that are "otherwise related to a case under title 11." Under § 157(b)(3), "[t]he bankruptcy judge shall determine, on the judge's own motion or on timely motion of a party, whether a proceeding is a core proceeding . . . or is a proceeding that is otherwise related to a case under title 11."

Based on a review of the complaint, the Court finds that the debtors alleged no causes of action arising in or under title 11; therefore, this is not a core proceeding. The test to determine if a matter is "related to" is "whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." *Moffitt v. Am.'s Servicing Co.* (*In re Moffitt*), 406 B.R. 825, 831 (Bankr. E.D. Ark. 2009) (quoting *Dogpatch Props., Inc. v. Dogpatch U.S.A., Inc.* (*In re Dogpatch U.S.A., Inc.*), 810 F.2d 782, 786 (8th Cir. 1987) (emphasis omitted); *see also Beskrone v. Int'l Educ. Corp.* (*In re PennySaver USA Publ'g, LLC*), 587 B.R. 43, 48-49 (Bankr. D. Del. 2018). Here, the debtors alleged causes of action arising under Arkansas law; specifically, the Arkansas Deceptive Trade Practices Act,[1] and the Court finds that the resolution of these causes of action could conceivably affect the administration of the bankruptcy estate. Should the

---

[1] As stated above, the debtors dismissed their fraud and negligence claims and proceeded only on the ADTPA claims stated in Counts I through III of their complaint.

debtors prevail on one or more of their ADTPA claims, the amount of the bank's secured claim could be affected, which, in turn, could impact the distribution available to other creditors under the debtors' chapter 13 plan.[2]  Therefore, the Court finds that it has jurisdiction over this matter as a non-core proceeding related to the bankruptcy case.  In non-core proceedings, without the consent of the parties to the bankruptcy court's entry of final judgment, "the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected."  28 U.S.C. § 157(c)(1).  However, in this proceeding, the parties entered into an agreed order on February 20, 2026, in which they expressly consented to this Court's entry of a final order.  (Dkt. No. 22.)  Therefore, the Court may enter a final judgment in this non-core proceeding.

## Facts

The debtors hold majority ownership interests in at least four business entities:  Rentco, Incorporated [Rentco]; Rentco Investment Properties, LLC [RIP]; Rentco Oklahoma Properties, LLC [Rentco Oklahoma]; and ZSR Enterprises, LLC [ZSR].  In 2004, Citizens extended a line of credit to Rentco, the corporation through which the debtors opened a construction rental business in Van Buren, Arkansas.  The debtors personally guaranteed Rentco's line of credit, which was secured by the debtors' home and Rentco's furniture fixtures, equipment, inventory and accounts [equipment].  In the following years, the debtors obtained and personally guaranteed several additional commercial loans from Citizens on behalf of their multiple business entities.  However, unlike Rentco's line of credit, which was partially secured by the debtors' home, the subsequent business loans were secured by real and personal property owned solely by the debtors' various business entities.

---

[2] The debtors' plan has not yet been confirmed and may require further amendment based on the outcome of this adversary proceeding and the resolution of the objections to confirmation filed by the bank and the chapter 13 trustee, both of which are scheduled for hearing on April 23, 2026.

The debtors and Citizens regularly executed modifications and renewals of the debtors' business loans. David Rofkahr [Rofkahr] testified that he gave Citizens financial statements, but he did not do so every year. (Trial Tr. 75-76, Feb. 25, 2026.) In regard to Rentco's line of credit, Rofkahr testified that he disclosed everything he was supposed to disclose to the bank and gave Citizens accurate copies of Rentco's accounts receivables. (Tr. 82-83.) Lance Lanier [Lanier], Executive Vice President of Citizens, testified that most of the debtors' business loans were reviewed by a committee and had to go though a formal approval process. (Trial Tr. 85.) Lanier testified that, for each loan, the bank looked for "debt coverage of at least of one to one, that you've got enough money to pay what your payments are going to be." (Tr. 133.) He said that every year including 2018, Rofkahr "still showed that he had a debt coverage good enough for us to continue to loan him money." (Tr. 133.)

Rofkahr testified that he wanted the bank to release the debtors' home as security for the line of credit and that it was his understanding that the house would be removed from the loan. Darla Brown [Brown], the primary loan officer that worked with the debtors, testified that Rofkahr did often request that the bank release the debtors' home as collateral for Rentco's line of credit. However, according to Brown, the bank never planned to remove the house as collateral, which she testified was not unusual because the bank's standard practice is to keep real estate as collateral for lines of credit. (Tr. 138-39.) Lanier testified that the bank considered the debtors' home to be the main collateral for Rentco's line of credit. (Tr. 104.) According to Lanier, "if handled correctly, [a line of credit] could go on for many, many years. And we usually have real estate as collateral, so that we can have a line of credit that can go on for years." (Tr. 124.)

Several years after opening Rentco in Van Buren, the debtors bought an existing construction rental business in Poteau, Oklahoma, the purchase of which they financed with Citizens through a separate entity, Rentco Oklahoma. Rofkahr testified that Rentco Oklahoma's loan was secured by equipment and real estate owned by Rentco Oklahoma. (Tr. 34.) For several years, the debtors' businesses operated successfully, earning in

4

excess of $1,000,000 per year.  (Tr. 82.)  Rofkahr testified that sometime in 2016, the debtors closed the Poteau location because industry had generally moved out of the Poteau area and the economy had declined.  (Tr. 60.)  When the Poteau location closed, the debtors moved that location's equipment to Rentco's still-operating Van Buren location without notifying Citizens.  (Tr. 35, 88, 100.)  The Van Buren location remained financially viable for a period of time after Poteau closed but its financial situation ultimately deteriorated as well, which Rofkahr primarily attributed to Covid.  (Tr. 61.)  The record reflects that other factors may have also contributed to Rentco's demise, including two of Rentco's employees embezzling a total of roughly $100,000 from the business and Rofkahr allowing his father-in-law to "rent" $600,000 to $700,000 worth of equipment at no charge.[3]  (Tr. 61, 77-78, 81.)  Whether caused by a single event or the convergence of several, each of the debtors' businesses, including Rentco's construction rental business, ZSR's convenience store, and a trash business,[4] met with financial difficulties.  Lanier testified that the bank and Rofkahr had a good relationship, and the parties had discussed a workout plan.  (Tr. 102, 128-30.)  Citizens drafted the documents for the workout, but the debtors did not sign them.  (Tr. 130.)  After the debtors' business loans became delinquent, the bank placed the loans in "nonaccrual" status, the regulatory ramifications of which are discussed below.

Lanier testified that Citizens is a state-chartered bank that is regulated by the Arkansas State Banking Commission [State or Commission].  (Tr. 125.)  Specifically, Lanier testified that "they alternate between the state and fed, as far as our examinations.  So,

---

[3]  Rofkahr also testified that he often went to casinos to play poker and the debtors' tax returns from 2011 through 2017 showed substantial gambling winnings, often between $200,000 to over $400,000 per year.  Citizens essentially argued that Rofkahr's gambling winnings mean that he also suffered gambling losses and such losses would have harmed the debtors financially.  However, despite the somewhat tempting logic of the bank's argument in this regard, there is no evidence in the record to prove the amount of the losses as Rofkahr's testified that he did not recall how much money he lost gambling during those years.

[4]  Rofkahr testified that the debtors had a trash business but did not say whether the debtors ran the trash business as a d/b/a or through a corporate entity.

every two to three years, we get an exam.  Safety and soundness is the main one that deals with lending.  And then, you've also got your compliance exam that you have." (Tr. 125.)  Lanier testified that the bank is required to abide by the State's guidelines regarding loans and "there's certain parameters that we have [to] stay within."  (Tr. 125-26.)  He also testified that the bank has its "own loan policy.  But if there's anything in that loan policy that doesn't agree with the way the State thinks we should be doing our banking business, then they require us to change our policy accordingly."  (Tr. 126.)  In addition, Lanier testified that "there are different regulations when we have a problem credit on exactly how we have to handle that, exactly how the money has to be applied. They give us direction on how we have to grade the loan . . . whether it's a two or three graded credit, which is good credit, or if it is a five or six graded credit, which ends up being on the watch list.  And then, at five, six, seven—seven's doubtful—but five, six, seven, there is also an opportunity that the loan would have to be placed on nonaccrual." (Tr. 126.)  According to Lanier, once a loan has been placed in nonaccrual status—which, pursuant to both Lanier's testimony and Plaintiffs' Exhibit 12, the subject loans had been placed in—the Commission regulates how the bank applies subsequent payments made on the loan.  Specifically, the regulations require the bank to apply all payments made on a nonaccrual loan to the principal balance of the loan and prohibit the bank from applying any portion of such payments to interest.  (Tr. 92-93.)

In 2018, the bank began foreclosing on the debtors' loans.  Rofkahr testified that the foreclosures impacted every aspect of his life, causing the debtors to lose their businesses and sources of income, harming their credit scores, and leading to their bankruptcy filing. (Tr. 30-31.)  By the time the debtors filed the instant adversary proceeding, all collateral for their various loans had been sold except for their home, which remains collateral for Rentco's line of credit.  The debtors allege in their complaint that Citizens engaged in predatory lending practices because the bank extended loans to the debtors without the use of borrower applications or any consideration of the debtors' ability to repay the loans.  The debtors also allege that Citizens intentionally misapplied the proceeds of certain foreclosure sales to increase its profits.  In particular, the debtors argue that all of the proceeds from the March 2021 auction of Rentco's equipment should have been used

6

to pay down Rentco's line of credit, which was secured by both Rentco's equipment and the debtors' home.

Lanier testified that the bank split the auction proceeds between two other loans that were also secured by the equipment: Loan 7504 taken out by Rentco and Loan 2768 taken out by Rentco Oklahoma.[5] Lanier explained that because the debtors had moved Rentco Oklahoma's equipment from Poteau to Rentco's Van Buren location without notifying the bank, the bank could not accurately track the proceeds from the auction of the commingled equipment and the proceeds were applied to the two loans on a percentage

---

[5] At trial, counsel for the bank offered into evidence as Defendant's Exhibit D [Exhibit D] the documents associated with Rentco Oklahoma's loan [Loan 2768], which, according to Exhibit D and Rofkahr's testimony, was secured by Rentco Oklahoma's real property and both Rentco Oklahoma's and Rentco's equipment. Counsel for the debtors objected to Exhibit D because the loan documents for Loan 2768 had not been produced by the bank in response to the debtors' discovery requests—specifically, in response to Interrogatory 8—but were instead provided the day before trial when the parties exchanged exhibits. *See* Fed. R. Civ. P. 37(c)(1) (providing for the automatic exclusion of evidence not produced in discovery unless the failure to produce was substantially justified or harmless). The Court provisionally admitted Exhibit D during the trial, and now fully admits Exhibit D into evidence. "[D]espite the 'automatic nature of Rule 37(c)(1) . . . '[p]reclusion of evidence is generally a disfavored action.'" *Engler v. MTD Prod., Inc.*, 304 F.R.D. 349, 355 (N.D.N.Y. 2015) (citation omitted). "[P]reclusion of evidence is a 'harsh remedy,' it should be imposed only in rare situations." *Engler*, 304 F.R.D. at 355 (citing *Ritchie Risk–Linked Strategies Trading v. Coventry First LLC*, 280 F.R.D. 147, 156–57 (S.D.N.Y. 2012) (internal citations omitted)). The Court finds that the bank's failure to provide the documents for Loan 2768 was not substantially justified despite the bank having objected to Interrogatory 8 because the interrogatory was allegedly not specific enough. However, the Court finds that the bank's failure to produce the loan documents was harmless. *See Smith v. Tenet Healthsystem SL, Inc.,* 436 F.3d 879, 889 (8th Cir. 2006) ("[a] harmless violation [] does not mandate exclusion of the evidence."); *see also Engler*, 304 F.R.D. at 355 ("[h]armlessness means an 'absence of prejudice.'") (citation omitted). Here, debtors' counsel received an accounting for Loan 2768 in the bank's discovery responses, debtors' counsel could have provided more specificity in response to the bank's objection to Interrogatory 8, the debtors would have received a copy of the documents when they executed Loan 2768, debtors' counsel was not entirely surprised at trial because the bank's counsel produced Exhibit D the day before trial, and Rofkahr testified to the pertinent portions of Exhibit D—namely, that Rentco's equipment partially secured Loan 2768. For these reasons, the Court finds that the bank's failure to produce the loan documents for Loan 2768 in its discovery responses did not prejudice the debtors and is therefore harmless.

basis. (Tr. 88, 101.) Lanier further explained that

> those two loans were secured by that equipment. The Poteau store, for
> sure, it was used to buy it. And then, the other store, I mean, when we had
> that original equipment filing with his house, that was from a long time
> ago. And, you know, you've got your current loans, that have the majority
> of the debt, that are secured by that equipment, and we had the equipment
> auction, so, to me, it makes sense to go apply those funds to the two
> equipment loans.

(Tr. 101-02.) Regarding why the bank did not apply the auction proceeds to Rentco's line of credit, Lanier testified, "[t]he other one was a line of credit that is basically—if you handle your line of credit like you're supposed to, it can go on forever, it just gets renewed each year. You come in and sign a renewal for it and it goes on for another year. You get to continue to use that line of credit." (Tr. 102.) Despite the bank's reasoning for applying the auction proceeds in the manner it did, the debtors maintain that, as a result of the bank's misapplication of the proceeds, they still owe $288,974.60 on Rentco's line of credit, which places their home in danger of foreclosure.

**Judgment on Partial Findings**

Immediately before closing arguments,[6] counsel for the bank moved for judgment on partial findings under Federal Rule of Civil Procedure 52(c), made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7052, asserting for the first time that, because Citizens is regulated by the Arkansas State Banking Commission, it is not subject to the debtors' ADTPA claims under the act's "safe-harbor" provision. The bank also argued in its motion that the debtors failed to meet the requirements necessary to prevail under ADTPA because they did not prove the bank engaged in any false or deceptive act and introduced no evidence or testimony to prove they suffered a specific, actual financial loss caused by the bank's actions as required under ADTPA.

In response to the bank's motion for judgment on partial findings, debtors' counsel did not contradict—or even address—the bank's contention that ADTPA does not apply to

---

[6] With opposing counsel's agreement and the Court's permission, the bank put on its case-in-chief during cross-examination of the debtors' witnesses.

Citizens under the safe-harbor provision.[7] Debtors' counsel argued that the debtors had met all the requirements under ADTPA, stating that the bank "engaged in a false or unconscionable or deceptive act in [the] practice of business, and, mainly, that has to do with taking funds that are to be applied to a certain loan and then moved to a separate loan" and the bank "intended that others rely on the concealment that would have been necessary for this to occur. And then it was proximate cause—financial loss was proximate cause." (Tr. 143.) Debtors' counsel argued that the debtors met ADTPA's financial loss requirement because David Rofkahr "discussed the loss of his three businesses, the loss of operating income . . . had to file personal bankruptcy, damage to his credit score. There has been ample evidence on the financial loss[.]" (Tr. 142-43.)

Because the bank's legal argument regarding the applicability of ADTPA is potentially dispositive, the Court must address this issue before moving, if necessary, to the bank's argument that it is entitled to judgment on partial findings because the debtors failed to prove the elements required under ADTPA. The safe-harbor provision cited by the bank is contained in Arkansas Code Annotated section 4-88-101, and states in relevant part:

> This chapter does not apply to:
> . . .
> (3) Actions or transactions specifically permitted under laws administered by the Insurance Commissioner, the Securities Commissioner, the State Highway Commission, the Bank Commissioner, or other regulatory body or officer acting under statutory authority of this state or the United States, unless a director of these divisions specifically requests the Attorney General to implement the powers of this chapter[.]

Ark. Code Ann. § 4-88-101(3).

---

[7] Because the bank did not raise its safe harbor argument in its answer or by filing a pretrial motion, but instead opted to wait until the adversary proceeding had been pending for more than two years and the trial had been concluded except for closing statements, the Court would have considered a request from debtors' counsel for leave to file a post-trial brief in response to the bank's newly-raised argument, had such a request been made.

Lanier testified, and the debtors did not dispute, that Citizens is a state-chartered bank regulated by the Arkansas State Banking Commission.  The Arkansas Supreme Court recently addressed ADTPA's applicability to a bank in *Tilley v. Malvern National Bank*, 709 S.W.3d 31 (Ark. 2025).[8]  In *Tilley*, Malvern National Bank [MNB], a federally regulated bank, moved for summary judgment on plaintiff Tilley's ADTPA claim, arguing that "because [the bank's] lending regime is authorized and regulated by the Officer of the Comptroller of Currency and the Federal Depository Insurance Commission, the challenged actions/transactions are permitted under the laws of the United States."  *Tilley*, 709 S.W.3d at 41.  In granting summary judgment in the bank's favor, the court stated:

> Tilley tries to couch this as a question of fact—essentially, that a jury must resolve whether MNB's actions were consistent with relevant federal law. But as we explained in *Arloe Designs, LLC v. Arkansas Capital Corporation*, [431 S.W.3d 277 (Ark. 2014)] "a national bank"—which MNB is—"is regulated by the Office of the Comptroller of Currency and the Federal Deposit Insurance Commission," and therefore, MNB's "actions and transactions are not subject to claims that can be brought under the ADTPA unless a specific request has been made to the Attorney General."  Put another way, because MNB's general lending regime is permitted and governed by the OCC and FDIC, the safe harbor applies. As a result, MNB is entitled to summary judgment on Tilley's ADTPA claim as a matter of law.

*Id.*

In *Tilley*, the Arkansas Supreme Court cited *Arloe* with approval and expressly rejected the plaintiff's argument that, in order to determine whether ADTPA's safe harbor provision applied to MNB, a trier of fact had to resolve whether the bank's actions were consistent with the relevant federal law.  *Id.*  In so holding, the court appears to have implicitly overruled *Air Evac EMS, Incorporated v. USAble Mutual Insurance Company*, 533 S.W.3d 572 (Ark. 2017).[9]  In *Air Evac*, the Arkansas Supreme Court departed from

---

[8] Although the debtors filed this adversary proceeding prior to *Tilley*, the Court must apply the law as it exists at the time the matter is decided.  *Flemens v. Harris*, 915 S.W.2d 685, 689-90 (Ark.1996) ("[t]he trial court correctly applied the decisional law of the [c]ourt as it existed when it decided [the] case.")

[9] The Arkansas Supreme Court's decision in *Air Evac EMS, Inc. v. USAble Mut. Ins. Co.*,

the general-activity rule under which the *Arloe* court had found that the safe-harbor provision furnished a blanket exemption from ADTPA to entities regulated by state or federal bodies, and held that "ADTPA's safe-harbor provision should be applied according to the specific-conduct rule, meaning that it precludes claims only when the actions or transactions at issue have been specifically permitted or authorized under laws administered by a state or federal regulatory body or officer." *Air Evac*, 533 S.W.3d at 575-76.

Without reference to *Air Evac*, the *Tilley* court cited *Arloe* as the precedent governing its determination of whether ADTPA applied to the bank before finding *as a matter of law* that, absent a request to the Attorney General pursuant to Arkansas Code Annotated section 4-88-101(3), the bank was exempt from ADTPA claims under the safe-harbor provision, irrespective of whether the bank had acted consistently with the laws administered by the federal regulatory bodies. *Tilley*, 709 S.W.3d at 41 (emphasis added).  Because *Tilley* cited *Arloe* with approval and followed *Arloe*'s application of the general-activity rule—an apparent reversal of *Air Evac*'s holding that the specific-conduct rule should apply—the Court finds that *Arloe* was not overruled by *Air Evac*. *See Goodwin v. Harrison*, 780 S.W.2d 518, 521 (Ark. 1989) (finding that a case had not been expressly or implicitly overruled because, despite an intervening and apparently contradictory decision, the court thereafter cited the earlier case with approval and followed its holding); *Oldner v. Villines*, 943 S.W.2d 574, 578-79 (Ark. 1997) (finding

---

533 S.W.3d 572 (Ark. 2017) was issued in response to the United States District Court for the Eastern District of Arkansas's certification of two questions:  first, "[a]re the rulings in *DePriest v. AstraZeneca Pharmaceuticals, L.P,* 351 S.W.3d 168 [(Ark. 2009)] and *Arloe Designs, LLC v. Arkansas Capital Corp.*, 2014 Ark. 21, 431 S.W.3d 277 (2014) in conflict with one another, and if so, should that conflict be resolved?"; and, second, "[d]oes the safe harbor provision of the Arkansas Deceptive Trade Practices Act, which exempts '[a]ctions or transactions permitted under laws administered by' state and federal regulators, Ark. Code Ann. § 4-88-101(3), apply to actions or transactions prohibited under laws administered by the state and federal regulators?" *Air Evac*, 533 S.W.3d at 573.  The court reformulated and answered the question "[s]hould the ADTPA's safe-harbor provision, Ark. Code Ann. § 4-88-101(3), be applied according to the specific-conduct rule or the general-activity rule?" *Id.*

11

that a prior case had been implicitly overruled because subsequent cases held to the contrary).  Therefore, applying the general-activity rule pursuant to *Tilley*, and absent any evidence that the Bank Commissioner requested that the Attorney General implement ADTPA's powers in regard to the bank, the Court finds that ADTPA does not apply to Citizens pursuant to the safe-harbor provision contained in Arkansas Code Annotated section 4-88-101(3).

However, even if the specific-conduct rule applies, and assuming—without finding—that the bank did not act in accordance with the laws administered by the Commission in its transactions with the debtors and, as a result, the bank is not protected by ADTPA's safe harbor, the Court finds that the debtors did not prove their claims under ADTPA. "ADTPA prohibits any 'unconscionable, false, or deceptive act or practice in business, commerce, or trade.'" *Apprentice Info. Sys. Inc. v. DataScout, LLC*, 544 S.W.3d 536, 539 (Ark. 2018) (quoting Ark. Code Ann. § 4–88–107(a)(10)).  "The elements of such a cause of action are (1) a deceptive consumer-oriented act or practice which is misleading in a material respect and (2) injury resulting from such act." *Id*.  Even if other potentially applicable Arkansas law required the bank to apply the proceeds from the March 2021 auction to the line of credit secured by the debtors' home before applying any proceeds to other loans,[10] the debtors did not introduce evidence sufficient to prove that the bank engaged in a deceptive act or practice when it applied the proceeds to the loans it did or that the bank mislead the debtors in any material respect.

Although Rofkahr repeatedly requested that the bank release the debtors' home as security for Rentco's line of credit and he testified that it was his understanding that the house would be removed from the loan, he offered no evidence to connect his belief to

---

[10]  Although the Court makes no finding here regarding whether the debtors would prevail under non-ADPTA Arkansas law on their claim that the bank should have first applied the foreclosure proceeds from the March 2021 auction to Rentco's line of credit because it was the only debt secured by their home, there is some support for such an argument. *See Lee v. Mercantile First Nat'l Bank*, 765 S.W.2d 17 (Ark. Ct. App. 1989) (finding that the debtors were entitled to have proceeds from the bank's sale of commercial collateral applied first to the debt that was secured by their home).

any act or representation by the bank. He referenced no bank-drafted document stating Citizens had agreed to release the house nor recounted any conversation during which a bank employee expressly told him, or even implied, that the bank agreed to release the house or intended to do so. Brown acknowledged that Rofkahr often asked that the bank release the home, but she specifically testified that the bank never agreed to do so. Similarly, the record does not reflect that the bank led the debtors to believe that it would apply the proceeds from the March 2021 auction of Rentco's equipment to Rentco's line of credit before directing the proceeds to any other loan. Additionally, debtors' counsel stated in response to the Court's questions that there is no provision in ADTPA that requires sale proceeds to be applied to loans in a certain order and he knew of no such requirement in the loan documents. (Tr. 149-50.) Lanier offered a reasonable basis for the bank to apply the auction proceeds in the manner it did, testifying that the proceeds were split on a percentage basis between two loans that were also secured by the equipment that was sold.

Even if the bank applied the auction proceeds to the wrong loans or, alternatively, applied the auction proceeds to loans that were secured by the auctioned equipment but should have first applied them to Rentco's line of credit, there is insufficient evidence upon which the Court could find that any misapplication occurred in the context of a deceptive act or practice on the part of the bank that mislead the debtors in a material respect. Therefore, the Court finds that the debtors did not meet ADTPA's first requirement in regard to their claim that the bank misapplied foreclosure proceeds; as a result, the Court need not address the second requirement. *See Parker v. Parker*, 520 S.W.3d 693, 699 (Ark. Ct. App. 2017) ("[a] private cause of action [under ADTPA] does not arise absent a showing of *both* a violation and resultant damages.") (emphasis in original).

The Court also finds insufficient evidence in the record to prove that the bank engaged in predatory lending. In *Gulfco of Louisiana, Inc. v. Brantley*, 430 S.W.3d 7, 14 (Ark. 2013),[11] the Arkansas Supreme Court affirmed a lower court's finding that a lender had

---

[11] The Court located few Arkansas predatory lending cases.

13

acted unconscionably and engaged in predatory lending.  Gulfco, the lender in *Brantley*, had loaned the borrowers funds secured by a mortgage on their home knowing that neither borrower had full-time employment and one of them had been ill:

> Despite the Brantley[s'] demonstrated inability to pay, Gulfco continued to loan them money. Each loan, that included built-in fees and high interest rates, placed the Brantleys in a position of ever-increasing debt, such that it was all but inevitable that they would end up in default. While the Brantleys' debt situation became more dire with each loan, Gulfco's risk was minimal, because with the mortgage, it was assured of receiving full payment on the loan.  Considering the totality of the circumstances, the circuit court found that the evidence revealed an intolerable pattern of reprehensible and unconscionable conduct on the part of Gulfco that offended its sense of decency and justice.  We cannot conclude that the circuit court's findings of unconscionability and predatory lending practices are clearly erroneous.

*Brantley*, 430 S.W.3d at 14.

The facts in the instant case bear little resemblance to those in *Brantley*.  Here, the debtors have not alleged that the bank charged them excessive fees or high interest rates. In contrast to the *Brantley* borrowers, who were both employed only part-time, the debtors here operated profitable businesses for a number of years that, at least for a time, earned $1,000,000 annually.  Rofkahr also testified that he provided accurate financial information to the bank.  Lanier testified that the bank reviewed the debtors' debt coverage ratio for each loan and most of the debtors' business loans were reviewed by a committee and went through a formal approval process.  There is no evidence that the bank made loans to the debtors or their businesses with the knowledge that the loans could not be repaid.  Rather, the record reflects that the debtors and the bank had a long-standing relationship that remained on good terms for many years.  When the debtors began experiencing financial problems, the bank discussed a potential workout with Rofkahr and drafted the paperwork but the debtors never signed it.  Under these circumstances, the Court cannot find that the bank was predatory in its lending to the debtors.

**Conclusion**

For the above-stated reasons, the Court grants judgment on partial findings in favor of the bank on the debtors' ADTPA claims. However, because the bank objected to the Court determining the amount of its secured claim in the context of this adversary proceeding, the Court will reserve such a determination for claims litigation.[12] If the debtors wish to object to the bank's amended proof of claim filed on December 1, 2025, they are ordered to do so within thirty days from the date of the entry of this order. If the debtors do not object to the bank's claim withing thirty days, the claim may constitute prima facie evidence of the validity and amount of the claim. *See In re Muller*, 479 B.R. 508, 512 (Bankr. W.D. Ark. 2012); Fed. R. Bankr. P. 3001(f).

IT IS SO ORDERED.

Honorable Bianca M. Rucker
United States Bankruptcy Judge
Dated: 03/30/2026

cc:  William Marshall Hubbard, attorney for debtors
M. Sean Brister, attorney for Citizens Bank
Joyce Bradley Babin, chapter 13 trustee
United States Trustee

---

[12] In both his opening statement and closing argument, counsel for the bank urged the Court to confine its ruling to the debtors' ADTPA claims and reserve a determination of the amount of the bank's secured claim for claims litigation. Although it would have been appropriate for the Court to determine the amount of the bank's secured claim in this adversary proceeding, the Court grants the bank's request and will permit the debtors to object to the bank's amended claim under applicable non-ADTPA law. However, because it is the bank that has sought to continue this dispute with the debtors via claims litigation, the Court will be disinclined to entertain a defense to the debtors' objection to claim that is premised upon any preclusive doctrine. *See Baptist Health v. Murphy*, 373 S.W.3d 269, 278 (Ark. 2010) (finding that res judicata may be waived); *Turcios v. Carter*, 678 S.W.3d 802, 811 (Ark. Ct. App. 2023) (discussing waiver of collateral estoppel).